SUCN. CABASSA VOUSTAD, ETC., demandantes y apelados, *v.* ERVIN RIVERA, demandado y apelante; SUCN. CABASSA VOUSTAD, ETC., demandantes y apelados, *v.* GENEROSA ORTIZ, demandada y apelante, y ESTADO LIBRE ASOCIADO DE PUERTO RICO, interventor y apelante.

*Números:* AC-89-653      *Resueltos:* 24 de junio de 1992
AC-89-689

*Luis E. Pérez Lebrón,* abogado de Ervin Rivera y Generosa Ortiz, apelantes; *Wilfredo Pérez Candelaria,* abogado de los apelados; *Jorge E. Pérez Díaz, Procurador General,* y *Anabelle Rodríguez, Procuradora General Auxiliar,* abogados del Estado Libre Asociado, interventor y apelante.

## SENTENCIA

Examinados los planteamientos de las partes y demás constancias, se dicta sentencia y se revoca la del Tribunal Superior, Sala de Mayagüez (Hon. Germán J. Brau Ramírez, Juez), que el 31 de agosto de 1989 decretó inconstitucional toda la Ley de Alquileres Razonables, Ley Núm. 464 de 25 de abril de 1946, según enmendada, 17 L.P.R.A. sec.

181 *et seq.* En su lugar, se dicta sentencia para acceder a los desahucios solicitados.

*Se devuelven los autos originales al foro de instancia para los trámites correspondientes a este mandato.*

Lo pronunció y manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió una opinión concurrente, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Alonso Alonso. El Juez Asociado Señor Rebollo López emitió una opinión concurrente y disidente. La Juez Asociada Señora Naveira de Rodón concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente y disidente, a la cual se unió el Juez Asociado Señor Fuster Berlingeri.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— o —

Opinión concurrente del Juez Asociado Señor Negrón García, a la cual se une el Juez Presidente Señor Andréu García y el Juez Asociado Señor Alonso Alonso.

I

Sostenemos una vez más la constitucionalidad de la Ley de Alquileres Razonables, Ley Núm. 464 de 25 de abril de 1946, según enmendada, 17 L.P.R.A. sec. 181 *et seq.*

La sucesión Cabassa Voustad es dueña de dos (2) propiedades ubicadas en la Calle Dr. Basora, Mayagüez. Por muchos años, ambas propiedades han estado arrendadas a Ervin Rivera y Generosa Ortiz. La ocupada por Rivera está dedicada a uso comercial, en la primera planta, y a uso residencial, en la segunda; mientras que Ortiz utiliza la

otra como vivienda. Los arrendamientos están sujetos al régimen de la Ley de Alquileres Razonables.

El 25 de noviembre de 1987 la sucesión, representada por su Administradora Ada Cabassa Voustad, instó en el Tribunal Superior, Sala de Mayagüez, sendas demandas de desahucio contra ambos inquilinos. En síntesis, expuso que a los fines de liquidar la sucesión, sus miembros deseaban vender las propiedades como una *sola unidad* y *libre de inquilinos*. Basó la causa de acción en el Art. 364 del Código Civil, 31 L.P.R.A. sec. 1425,([1]) y en la norma establecida en *Pizá v. Sailles Travel Agency*, 114 D.P.R. 33 (1983). Además, adujo que de no prevalecer en sus planteamientos, cuestionaría la constitucionalidad de la Ley de Alquileres Razonables por violar las cláusulas sobre debido proceso e igual protección de las leyes contenidas en el Art. II, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1.

Oportunamente las acciones fueron consolidadas y el Estado compareció como interventor. El 31 de agosto de 1989, el tribunal (Hon. Germán J. Brau Ramírez, Juez) dictó sentencia. Como parte de sus determinaciones de hechos, concluyó que la sucesión recibió ofertas de compra por setecientos cincuenta mil dólares ($750,000), *sujetas* a que las propiedades fueran entregadas sin inquilinos. Resolvió que la ley no permitía el desahucio en casos de ventas para efectuar una partición sucesoria. Esa restricción, a su juicio, configuraba una incautación de la propiedad por el Estado sin justa compensación debido a la ausencia de un estado de emergencia en el país, lo cual estaba vedado por el Art. II, Sec. 9 de nuestra Constitución, *supra*. Declaró inconstitucional toda la ley. Erró.

---

([1]) Dispone:

"La buena fe se presume siempre, y al que afirma la mala fe de un poseedor corresponde la prueba." 31 L.P.R.A. sec. 1425.

## II

En nuestro sistema republicano de gobierno, el poder judicial tiene la facultad de interpretar las leyes. En el descargo de esa función, hemos reconocido que *"el legislador no puede anticipar nunca todas las posibilidades imaginables en el elenco de situaciones en que la dinámica y conducta humanas se desenvuelven. En esas instancias, nuestra misión suprema es salvar —por la preeminencia del derecho envuelto— aquellas situaciones en las cuales una interpretación literal y rigurosa plantearía graves interrogantes y objeciones de carácter constitucional.* Así, cuando el texto legal habla y se configura en términos *absolutos*, requiere que hagamos un esfuerzo por evitar el choque constitucional, si bien validándolo, pero atemperándolo si posible, y se logra satisfactoriamente la armonía entre el interés gubernamental envuelto y el valor primario ...". (Énfasis suplido y en el original.) *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 429 (1980).

Y es que, al enfrentarnos a situaciones no visualizadas por el legislador, si posible, nuestro deber es ajustar la ley conforme a su espíritu y a sus propósitos. *Medina & Medina v. County Pride Foods*, 122 D.P.R. 172 (1988).

> En materia de hermenéutica constitucional y ante estatutos que adolecen de inconstitucionalidad por sub-inclusión, *se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos* ... el impedimento constitucional podrá ser salvado, *no mediante la interpretación del texto que por sus claros términos no es susceptible de serlo de otra manera, sino por la extensión de los beneficios a la clase excluida.* El propósito legislativo, que quedaría frustrado con la anulación del estatuto, queda así en vigor y se supera el discrimen. (Énfasis suplido y en el original.) *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618–619 (1981).

## III

Por todos es conocido que la Ley de Alquileres Razonables es un estatuto no sólo de control de precios, sino de profundo contenido social. Aunque en su origen respondió al estado de emergencia surgido a raíz de la Segunda Guerra Mundial, su vigencia trascendió esa época como instrumento del Gobierno para solucionar, en parte, el problema de la escasez de vivienda.

Aplica a unidades de viviendas con una renta de menos de doscientos dólares ($200), y de menos de cuatrocientos dólares ($400) cuando se trate de locales comerciales. Art. 4 (17 L.P.R.A. sec. 184). Al vencimiento del contrato de arrendamiento, éste se prorrogará a opción del inquilino. Art. 12 (17 L.P.R.A. sec. 192). Esta restricción obliga a cualquier propietario que subsiguientemente adquiera la propiedad. Art. 15 (17 L.P.R.A. sec. 205). Cualesquiera cláusulas contractuales limitativas de estos beneficios será nula. Art. 14 (17 L.P.R.A. sec. 204).

A modo de excepción, la ley dispone que el arrendador podrá desahuciar: (1) por falta de pago en el alquiler mensual; (2) cuando la conducta del inquilino sea inmoral o represente un peligro o estorbo para la propiedad o los vecinos; (3) si subarrienda o cede el uso de la propiedad en violación del contrato; (4) si el inquilino dedica la propiedad a un uso distinto del pactado y ello causa perjuicio al arrendador; (5) cuando el inquilino maliciosa o negligentemente causa daños a la propiedad o de algún modo modifica la configuración de la vivienda sin permiso; (6) cuando de *buena fe* el dueño necesite el local para ocuparlo inmediatamente como lugar de vivienda; (7) tratándose de un local comercial, cuando el dueño lo necesite y no tuviere otro local en el mismo edificio, y (8) por proyectar el propietario la demolición total o parcial del edificio para construir uno nuevo. Art. 12-A (17 L.P.R.A. sec. 193).

Al interpretar algunas de estas disposiciones, en lo re-

lativo a *locales comerciales,* hemos decidido que el dueño tiene derecho a desahuciar al inquilino si desea retirar la propiedad del mercado de alquileres y ventas, aunque no vaya a utilizarla personalmente. *Raluan Corp. v. Feliciano,* 111 D.P.R. 598 (1981); *Roselló Hnos. v. Figueroa,* 74 D.P.R. 432 (1953). En estas instancias, no es requisito acreditar la buena fe. *Pizá v. Sailles Travel Agency,* supra, págs. 35–37.

Sin embargo, en cuanto a las propiedades dedicadas a *vivienda,* el desahucio procede en los supuestos contenidos en la ley, siempre que sea para ser ocupada inmediatamente por el dueño en calidad de residencia. *Rodríguez Rodríguez v. Tribunal Superior,* 100 D.P.R. 421 (1972); *Vidal v. Corte,* 71 D.P.R. 582 (1950). Incluso, en *Méndez v. Tribl. de Distrito,* 72 D.P.R. 544 (1951), resolvimos que la ley no permite el desahucio sólo porque el dueño desea retirar la vivienda del mercado de alquileres para ocuparla su hijo.

## IV

En el caso de autos, la cuestión no sólo es novel, sino distinta. La sucesión Cabassa Voustad interesa vender al mejor precio posible e inmediatamente efectuar la partición. Estamos, pues, ante unas circunstancias no pautadas expresamente por el legislador. El estatuto guarda silencio y debemos llenar esa laguna.

Incuestionablemente, al igual que en el pasado, hoy día subsisten los males que quiso atacar esta ley.(2) La savia

---

(2) "El problema de la vivienda es uno de los más serios con que se confronta el pueblo de Puerto Rico. La densidad de la población en vivo contraste con la limitada extensión geográfica del suelo, la concentración de una gran parte de las tierras en manos de corporaciones y de una minoría de grandes terratenientes, el éxodo de población rural hacia los grandes centros urbanos, el bajo nivel de salarios e ingresos prevalecientes en el país, *la especulación en el arrendamiento de viviendas, solares, casas y edificaciones a base de alquileres* injustos, irrazonables y abusivos, y otros factores económicos y sociales agravan el problema de la vivienda hasta el punto de

legislativa que nutre las limitaciones estatutarias al desahucio —con la concesión de una prórroga automática a voluntad del arrendatario— es evitar la especulación con los cánones y proveerles a los arrendatarios la potestad de permanecer en la propiedad en vista de la carencia de vivienda existente.

Es evidente, pues, que las limitaciones sobre desahucio no son en sí mismas el fin legislativo. Son el medio o instrumento para lograr implantar la política pública de "reglamentar el alquiler de modo que éste [sea] razonable ante una situación anormal de escasez de locales ...". *Colón Vélez v. Lebrón*, 97 D.P.R. 154, 159 (1969). Y es que el legislador no eliminó el desahucio, sino que lo limitó, pues era consciente de que en ciertas situaciones era necesario, y ello no constituía un escollo en la consecución de su política pública.

## V

Por otro lado, como instituto jurídico, la partición sucesoria necesariamente conlleva el traspaso de la propiedad de manos de la sucesión a su nuevo adquirente. En el fondo, ello no representa la situación de un propietario que, enteramente libre, toma la decisión de negociar la venta de la propiedad sin inquilinos o aumentar los cáno-

crear una situación de emergencia que afecta el bienestar, la salud, la seguridad y la vida de cientos de miles de mujeres, hombres y niños a través de los campos y pueblos de Puerto Rico.

"... Miles de familias pobres enclavan sus viviendas en solares ajenos, por los cuales cobran sus dueños actualmente alquileres opresivos. Prácticas especulativas de carácter similar se han extendido también a las casas y edificios que se usan para negocios, y fines comerciales e industriales.

"Para asegurar adecuada protección al pueblo de Puerto Rico en lo que concierne a este grave problema de la vivienda, falta, sin embargo, legislación apropiada sobre inquilinato, a fin de evitar la especulación por parte de los arrendadores, de garantizar alquileres razonables y de amparar convenientemente los derechos de los inquilinos." (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 464 de 25 de abril de 1946 (17 L.P.R.A. sec. 181).

nes de arrendamiento, con fines especulativos económicos. Más bien se asemeja a la venta forzosa en pública subasta, a cuya situación *no* le aplica la prórroga obligatoria del Art. 15, *supra*, pues el concepto de "venta" contenido en él es equiparable con actos de libre voluntad del dueño como la cesión y enajenación. *Housing Investment Corp. v. Luna*, 112 D.P.R. 173, 175 (1982). En dicho caso sostuvimos que, aunque tanto la Ley Hipotecaria y del Registro de la Propiedad como la Ley de Alquileres Razonables cumplen propósitos de gran valor social, las limitaciones sobre el desahucio no son absolutas y sólo aplican a contratos de arrendamiento otorgados con anterioridad a la hipoteca.

No es necesario una profunda exégesis para comprender que estamos aquí ante una de las circunstancias no contempladas por el legislador. La norma imperante en nuestro ordenamiento jurídico *no* favorece la propiedad en comunidad, sino su individualización *"para evitar los frecuentes y graves males que provienen de la diversidad de condominios ....* Siendo este derecho una consecuencia directa del derecho de propiedad que corresponde a cada copropietario, se presenta como la expresión de la voluntad de cada uno de ellos, *frente a todos los demás, que se ven en la necesidad de soportarla; sin que puedan ni impedir que se produzca su efecto extintivo, ni sustraerse a sus efectos jurídicos. Es, pues, un acto unilateral, que actúa un derecho absoluto, y que no pierde sus características, por la existencia, en algunos casos, de límites legales a su ejercicio .... La limitación de este derecho del copropietario sólo puede ser impuesta por la ley, como reflejo de una limitación al derecho de propiedad, basada en la teoría del abuso del derecho*, porque es indudable que haciendo uso de aquella facultad, sin limitación en este sentido, podría ser utilizada en ciertos casos, sin justificación, ni necesidad". (Énfasis suplido y escolio omitido.) J. Beltrán de Heredia y Castaño, *La comunidad de bienes en Derecho español*, Madrid, Ed. Rev. Der. Privado, 1954, págs. 332–334.

La comunidad hereditaria es una modalidad de la propiedad comunitaria en general. Por ende, la norma antes expuesta sobre partición le aplica, precisamente "a fin de que sabiendo cada uno cuáles [bienes] son suyos, lo custodie con más diligencia, se apodere y disponga de ellos a su arbitrio como dueño y propietario y se eviten las discordias que de la falta de proindivisión se originan, *pues ninguno puede ser compelido a tener contra su voluntad comunidad de bienes con otros* (ley 1.a, título 10, Partida 5.a, ley final Código Justinianeo: '*Communi dividundo*'); *ni vale el pacto de subsistir siempre en ella* ('*Inconmuni dividundo*'); como tampoco debe se[r] obedecido en esta parte el precepto del testador, *porque la comunidad perpetua está prohibida por derecho* (ley *Hoc iudicium*) … ". (Énfasis suplido.) E. Barcenas Simarro, *Particiones hereditarias extrajudiciales testamentarias y abintestatos y formularios sobre herencias*, Madrid, Ed. Forma Gráfica, S.A., 1978, T. I, pág. 14.

Nuestro Código Civil incorporó estos principios en el precepto de que ningún coheredero está obligado a permanecer en la indivisión. Art. 1005 (31 L.P.R.A. sec. 2871). A fin de cuentas, la comunidad hereditaria es "*una situación transitoria e inestable, fuente de litigios, obstáculo al establecimiento de relaciones jurídicas regulares y dañosa a la economía* …. El derecho de todo comunero a pedir la división es imprescriptible … porque renace y se perpetúa en cada momento de la comunidad. Es un derecho potestativo y de caracterización o modificación jurídica; no porque permita imponer una determinada división, ni practicarla al legitimado, sino porque faculta para pedirla, es decir, para provocar necesariamente la división, con el consiguiente cambio de los derechos de participación en titularidades individuales independientes". (Énfasis suplido y escolio omitido.) J.R. Lacruz Berdejo y F.A. Sancho Rebullida, *Derecho de Sucesiones*, Barcelona, Librería Bosch, 1971, T. I, págs. 209–210.

Lo expuesto refleja que estamos, pues, ante dos intere-

ses tutelados por el Estado. Aunque importantes, ninguno es absoluto. Hemos visto que en las circunstancias de autos, el no permitir el desahucio obligaría a la sucesión Cabassa Voustad a recibir una cantidad menor de dinero al verse compelida a vender sujetos a la permanencia de los inquilinos. La otra opción sería mantenerse en un estado perpetuo de indivisión. Ciertamente esta última coarta el derecho de los herederos a solicitar la partición. La voluntad del heredero de no permanecer en la indivisión prácticamente estaría supeditada a la del inquilino e incluso a la de sus herederos cuando éste falleciera ocupando la propiedad. Art. 12-C (17 L.P.R.A. sec. 195). No podemos atribuirle al legislador semejante propósito.

Concluimos que el concepto de "venta" contenido en el Art. 15 de la Ley de Alquileres Razonables, *supra*, excluye las motivadas por la partición de una sucesión. En esas circunstancias, el desahucio procede como parte del trámite de liquidación de la sucesión. Esta interpretación guarda armonía con los propósitos legislativos encarnados en la ley, a la par que salva el pronunciamiento de inconstitucionalidad decretado por el ilustrado tribunal de instancia.

Por estos fundamentos, concurrimos con la sentencia revocatoria.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

Hemos entendido necesario y procedente expresarnos por separado en el presente caso en vista de que no estamos de acuerdo con unas expresiones que, curiosamente, se hacen *por separado* —referentes las mismas a la constitucionalidad de la Ley de Alquileres Razonables— en las dos (2) restantes Opiniones concurrentes suscritas por

cinco (5) de los integrantes del Tribunal; *ponencias que le sirven de base a la Sentencia que se emite en el día de hoy en el caso de epígrafe.* Consideramos apropiado exponer nuestros puntos de vista sobre la controversia planteada.

I

Las referidas Opiniones concurrentes constituyen, no hay duda, un extraordinario esfuerzo de los integrantes del Tribunal por extender la vida jurídica de la moribunda Ley de Alquileres Razonables, Ley Núm. 464 de 25 de abril de 1946 (17 L.P.R.A. sec. 181 *et seq.*).

*Concurrimos con el resultado al que se llega en la Sentencia mayoritaria* emitida por razón de que la misma *reconoce y garantiza* el derecho de los miembros de la Sucesión aquí en controversia a desahuciar a los inquilinos de una propiedad perteneciente a dicha Sucesión. *Diferimos de las Opiniones concurrentes* en tanto y en cuanto las mismas pretenden validar, una vez más, la constitucionalidad de la referida Ley de Alquileres Razonables, *posición sobre la cual tenemos serias reservas.*

Nuestra preocupación al respecto *no* se basa en que la mencionada Ley de Alquileres Razonables se haya tornado obsoleta o anacrónica —véase *Pueblo Int'l, Inc. v. Srio. de Justicia*, 122 D.P.R. 703 (1988)— o que se haya resuelto sustancialmente en nuestro País el problema de vivienda que propició su aprobación. Tampoco cuestionamos que la referida ley, al igual que aquellas similares aprobadas en los Estados Unidos, representaron una medida de justicia social en beneficio de una clase que era la más afectada durante la recesión económica de la época post-guerra a fines de la década de 1940.

*El problema es uno más complicado, constituyendo el caso específico ante nuestra consideración evidencia fehaciente de ello.* El caso de epígrafe resulta ser ilustrativo de uno de los *efectos no intencionales ni esperados* por el legis-

lador al conceder *ad-infinitum* una prórroga del arrendamiento y al restringir las condiciones bajo las cuales se permite al arrendador disponer de su propiedad bajo la mencionada ley.[1]

No obstante el *loable propósito* que animó al legislador, en un momento determinado de nuestra historia, al aprobar la Ley de Alquileres Razonables, un análisis de la misma, desde la perspectiva de su efecto económico sobre el arrendador propietario del inmueble, *inevitablemente nos lleva a la conclusión de que el Estado se ha excedido en el ejercicio de su poder. Sin duda, la referida ley es una de naturaleza socioeconómica que afecta o restringe el derecho de propiedad. Cuestionamos la restricción irrazonable de este derecho que queda prácticamente sujeto a la voluntad y expectativa de vida del arrendatario y sus descendientes.* La pérdida de naturaleza económica del arrendador, junto a la restricción de su derecho a disponer libremente, y sin trabas, de su propiedad, *puede equipararse* a una expropiación forzosa sin mediar una justa compensación.[2]

---

[1] En *Pennell v. San Jose*, 485 U.S. 1, 22 (1988), el Hon. Juez Scalia (a quien se unió la Hon. Juez O'Connor), en su voto concurrente en parte y disidente en parte, expresó lo siguiente: "Here the city is not 'regulating' rents in the relevant sense of preventing rents that are excessive; rather, it is using the occasion of rent regulation ... to establish a welfare program privately funded by those landlords who happen to have 'hardship' tenants". Citando al Tribunal Supremo del estado de Nueva Jersey en *Prop. Owners Ass'n, etc. v. Tp. of No. Bergen*, 74 N.J. 327, 339; 378 A.2d 25, 31 (1977), el Hon. Juez Scalia concluyó que: " '[a] legislative category of economically needy senior citizens is sound, proper and sustainable as a rational classification. But compelled subsidization by landlords or by tenants who happen to live in an apartment building with senior citizens is an improper and unconstitutional method of solving the problem' ". *Pennell v. San Jose*, ante, págs. 23–24.

[2] Para la discusión del desarrollo de este tipo de análisis en el Tribunal Supremo de los Estados Unidos, refiérase a K. Manheim, *Tenant Eviction Protection and the Takings Clause*, 1989 Wis. L. Rev. 925 (1989). En *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 517 (1987), se explicó que "[economic] analytical tools where the government has physically taken an identifiable segment of property. Physical appropriation by the government leaves no doubt that it has in fact deprived the owner of all uses of the land. Similarly, *there is no need for further analysis where the government by regulation extinguishes the whole bundle of rights in an identifiable segment of property, for the effect of this action on the holder of the property is indistinguishable from the effect of a physical taking*". (Énfasis suplido y escolio omitido.)

Si bien es cierto que la legislación en el área de control de cánones de arrendamiento en los Estados Unidos resistió ataques a su constitucionalidad por, entre otras, la razón de emergencia nacional que sustentó su aprobación,(³) la "segunda generación" de estas leyes, o sea, aquellas aprobadas durante los años sesenta y setenta, han sido objeto de serio análisis y cuestionamiento por algunos tribunales a la luz del desarrollo de la protección constitucional en el área del derecho de propiedad.(⁴)

En fin, las expresiones aquí vertidas constituyen una *apretada síntesis* de nuestras reservas y preocupaciones sobre la constitucionalidad de la Ley de Alquileres Razonables, que hoy a duras penas se intenta sostener. Somos del criterio que, *a menos que se provean por el legislador alternativas menos restrictivas al derecho de propiedad,* es du-

---

(³) Refiérase por ejemplo a *Levy Leasing Co. v. Siegel,* 258 U.S. 242 (1922); *Block v. Hirsh,* 256 U.S. 135 (1921); *Woods v. Miller Co.,* 333 U.S. 138 (1948), y *Bowles v. Willingham,* 321 U.S. 503 (1944).

(⁴) Refiérase a Nota, *The Constitutionality of Rent Control Restrictions on Property Owner's Dominion Interests,* 100 Harv. L. Rev. 1067, 1071–1075 (1987), donde se discuten (entre otros) los casos de *Gregory v. City of San Juan Capistrano,* 142 Cal. App.3d 72, 191 Cal. Rptr. 47 (1983), y *Hall v. City of Santa Barbara,* 797 F.2d 1493 (9no Cir. 1986), *como ejemplos donde se han invalidado estatutos de control de rentas por restringir o privar al propietario de la utilización y disposición (control) de su propiedad.* Allí se explica que esta importancia a la protección contra la interferencia o restricción del propietario está apoyada en las decisiones del Tribunal Supremo de los Estados Unidos sobre la naturaleza fundamental del derecho de "excluir a otros" (*right to exclude*), entre otros. Favor de remitirse a los casos citados en la nota al calce 48, a la pág. 1074 del referido Artículo.

En *Richardson v. City and County of Honolulu,* 759 F. Supp. 1477 (D. Haw. 1991), el Tribunal de Distrito Federal para el Distrito de Hawaii concluyó que una ordenanza que imponía un tope o máximo para ser cobrado como canon de arrendamiento constituía un *taking* al arbitrariamente utilizar el máximo de canon permisible en la renta pagada al inicio del contrato de arrendamiento. Allí se determinó (entre otras) que tal acción no le permitía a los arrendadores obtener una retribución justa y razonable. En *Richardson v. City and County of Honolulu,* ante, se discuten otros casos donde los estados han declarado estatutos similares inconstitucionales. Entre estos nos remiten a *Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 550 P.2d 1001, 130 Cal. Rptr. 465 (1976), y *Cromwell Assocs. v. Newark,* 211 N.J. Super. 462, 511 A.2d 1273 (1985).

La interpretación que del caso de *Pennell v. San Jose,* ante, se hace en una de las Opiniones concurrentes es una interpretación equivocada, por lo amplia. De unas expresiones cuidadosamente fraseadas por dicho alto Tribunal se hace una inferencia extremadamente abarcadora y errónea.

doso que el referido estatuto resista por mucho más tiempo ataques a su constitucionalidad.([5])

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une el Juez Asociado Señor Fuster Berlingeri.

Por entender que la Ley de Alquileres Razonables es constitucional, concurro con la parte I de la opinión mayoritaria. Sin embargo, disentimos de la conclusión de la parte V de que el concepto de "venta" contenido en el Art. 15 de la Ley de Alquileres Razonables, 17 L.P.R.A. sec. 205, excluye las motivadas por la partición de una sucesión.

I

Los miembros que componen la sucesión Cabassa Voustad, en virtud de herencia, advinieron propietarios de unos locales que estaban sujetos al régimen de la Ley de Alquileres Razonables, 17 L.P.R.A. sec. 181 *et seq.*

Por entender que no era para ellos económicamente factible vender estas propiedades con la sujeción de arrendamientos bajo la Ley de Alquileres Razonables, el 25 de noviembre de 1987 presentaron sendas demandas de desahucio contra Ervin Rivera y Generosa Ortiz, inquilinos de dichos locales. Alegaron, en síntesis, que la única forma de dividir o liquidar la sucesión era mediante *la venta* de estas propiedades después de su retiro del mercado de alquileres. La sucesión cuestionó, además, la cons-

---

([5]) Para una discusión de las posibles tendencias de los tribunales en esta área, remítase a los artículos siguientes: L.L. Westray, *Are Landlords being taken by the Good Cause Eviction Requirement?*, 62 S.Cal. L. Rev. 321 (1988); T.O. Morris, *Rent Control Exemption*, 32 How. L. J. 307 (1989), y W.Z. Hirsch y J.G. Hirsch, *Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol*, 35 U.C.L.A. L. Rev. 399 (1988).

titucionalidad de la Ley de Alquileres Razonables porque alegadamente violaba las cláusulas sobre el debido procedimiento de ley y la de igual protección de las leyes de la Sec. 7 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

El Tribunal Superior, Sala de Mayagüez, resolvió que la Ley de Alquileres Razonables no permitía el desahucio en casos de venta para efectuar una partición sucesoria. No obstante, declaró inconstitucional dicha ley a tenor con la cláusula *de justa compensación* contenida en la Sec. 9 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1.

De dicha sentencia apela ante nos el Estado Libre Asociado de Puerto Rico representado por el Procurador General.

## II

Concurro con la mayoría del tribunal en que la Ley de Alquileres Razonables es constitucional. La Sec. 9 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, ed. 1982, pág. 296, dispone:

> No se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley.

Las leyes sobre el control de alquileres reglamentan una actividad económica y, en cierta medida, regulan el uso que se le puede dar a la propiedad. L.C. Becker, *Rent Control is not a Taking,* 54 Brooklyn L. Rev. 1215, 1217 (1989). Una incautación en estos casos sólo ocurre cuando al propietario se le ha privado sustancialmente de todo uso razonable de su propiedad. Véanse: *Griffin Development Co. v. City of Oxnard,* 703 P.2d 339, 344 (Cal. 1985); *Agins v. City of Tiburon,* 598 P.2d 25 (Cal. 1979).

En *Pennell v. San Jose,* 485 U.S. 1 (1988), el Tribunal Supremo de Estados Unidos rechazó un ataque constitu-

cional a una ley sobre el control de alquileres señalando que ese tipo de reglamentación no constituía una incautación per se. A esos efectos señaló específicamente: "[s]tates have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulations entails." Íd., pág. 12 esc. 6 (citando *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982)). Véase, además, P.D. Salins, *Reflections on Rent Control and the Theory of Efficient Regulation*, 54 Brooklyn L. Rev. 775 (1988).

De lo anterior se desprende que el Tribunal Supremo de Estados Unidos no considera que las leyes sobre el control de alquileres violen la Quinta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, equivalente a la Sec. 9 del Art. II de nuestra Constitución, *supra.* Ello es así ya que dicho Foro en innumerables ocasiones ha concluido que las reglamentaciones económicas que regulan las ganancias de un propietario de terrenos no constituyen una incautación en tanto y en cuanto el dueño del terreno obtenga una ganancia razonable sobre su inversión.[1]

Al declarar inconstitucional la Ley de Alquileres Razonables, el tribunal a quo determinó que dicha ley privó a la sucesión Cabassa Voustad de su derecho a una justa compensación por su propiedad. Como norma general, para que se active la cláusula de justa compensación es indispensable que la reglamentación impugnada prive a su propietario *de todo uso razonable* de su propiedad. En la medida en que el dueño del inmueble pueda derivar algún

---

[1] El Tribunal Supremo de Estados Unidos ha sostenido que reducciones de un 75% y un 90% en el valor de propiedades, producto de leyes de zonificación, no constituyen incautaciones confiscatorias. Véase *Euclid v. Ambler Co.*, 272 U.S. 365 (1926); *Hadacheck v. Los Angeles*, 239 U.S. 394 (1915); *William C. Hass v. City & Cty. of San Francisco*, 605 F.2d 1117 (9no Cir. 1979); *Penn. Central Transp. Co. v. New York City*, supra, pág. 131; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Sec. 9-3.

beneficio económico de ésta, no se activa la cláusula de justa compensación.

Ciertamente la sucesión Cabassa Voustad puede derivar beneficios económicos de las propiedades, aun cuando éstas estén sujetas al régimen de la Ley de Alquileres Razonables. De hecho, como la propiedad en controversia fue heredada, los miembros de la sucesión han recibido un activo sin tener que hacer una inversión directa y el rédito que por ende obtienen por la propiedad actualmente alquilada es razonable. Véase a modo de referencia, T. Negrón Medero, *Situación del mercado de alquileres en Puerto Rico para los años 1940 y 1970*, 36 Rev. C. Abo. P.R. 598 (1975). De los autos se desprende que se han limitado a recibir ofertas por las propiedades, pero no surge que hayan intentado la venta de las mismas con los inquilinos. Entendemos que, aun con los arrendamientos vigentes, la sucesión puede realizar distintos negocios jurídicos con estas propiedades que le produzcan beneficios económicos.

## III

Por otro lado, la opinión mayoritaria sostiene que el término "venta" a que se refiere el inciso (b) del Art. 15 de la Ley de Alquileres Razonables, 17 L.P.R.A. sec. 205(b), excluye aquellas ventas motivadas por la partición de una sucesión. En vista de que esta interpretación es incompatible con los términos claros y precisos de la ley, no podemos suscribir la parte V de la opinión mayoritaria.

Es principio rector de los cánones de hermenéutica que el texto claro y sin ambigüedades de la ley es la expresión por excelencia de la intención del legislador. Dispone el Art. 14 de nuestro Código Civil que, "[c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". 31 L.P.R.A. sec. 14. Véanse, también: *Irizarry v. Registrador*, 61 D.P.R. 74 (1942); *Piñan Vda. Fajardo v. Srio. de*

*Hacienda*, 83 D.P.R. 314 (1961); *Cruz Fontánez v. Registrador*, 126 D.P.R. 182 (1990).

En el día de hoy la mayoría de esta Curia usurpa la Rama Legislativa al enmendar el Art. 12-A de la Ley de Alquileres Razonables, 17 L.P.R.A. sec. 193, para incluir una nueva causal de desahucio de inquilinos. Además, obvia en su análisis las disposiciones fundamentales de nuestro Código Civil referentes a la sucesión, en particular, los Arts. 599 y 601 (31 L.P.R.A. secs. 2081 y 2083) que disponen que una sucesión es la transmisión de los derechos y obligaciones (bienes) del difunto a sus herederos tales como existían al tiempo de su muerte, *comprendiendo también las cargas y obligaciones que le fueran inherentes*. 31 L.P.R.A. sec. 2081 *et seq.*

A esos efectos señala Hernández Gil que las relaciones obligacionales tales como los arrendamientos son claramente susceptibles de transmitirse mortis causa. A. Hernández Gil, *Lecciones de Derecho Sucesorio*, Madrid, 1969, págs. 34–35. A esa misma conclusión llegan Lacruz Berdejo y Albaladejo cuando señalan que la *posición del arrendador* en la sucesión universal forma parte del caudal relicto y su eficacia subsiste por operación del Art. 1257 del Código Civil español.[2] J.L. Lacruz y M. Albaladejo, *Derecho de Sucesiones*, Barcelona, Librería Bosch, 1961, págs. 114–115.

En el caso de autos, el causante transmitió a sus herederos dos (2) propiedades gravadas con arrendamientos sujetos a la Ley de Alquileres Razonables.[3]

---

[2] El Art. 1209 de nuestro Código Civil (equivalente al Art. 1257 español) dispone, en lo pertinente, que "[l]os contratos sólo producen efecto entre las partes que los otorgan y sus herederos; salvo en cuanto a éstos, el caso en que los derechos y obligaciones que proceden del contrato no sean transmisibles, o por su naturaleza, o por pacto, o por disposición de la ley." 31 L.P.R.A. sec. 3374. Véase, además, J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, págs. 259–260.

[3] En el pasado hemos tenido ante nuestra consideración situaciones análogas a ésta. Véanse: *Sucn. Pérez v. Gual*, 75 D.P.R. 385, 386 (1953); *Sucn. Ramírez v.*

Los miembros de la sucesión adquirieron dichos inmuebles con *las cargas y obligaciones inherentes* a ellos, por lo que no pueden eximirse de la aplicación de las claras disposiciones de la Ley de Alquileres Razonables con el pretexto de realizar la partición hereditaria.([4]) En vista de estas doctrinas de nuestro derecho privado, no podemos endosar que desde este estrado apelativo, mediante una interpretación estatutaria, se establezca una nueva causal de desahucio para permitir "las motivadas por la partición de una sucesión". Opinión concurrente del Juez Asociado Señor Negrón García, pág. 832.

Aunque somos conscientes de que esta interpretación permite que el Tribunal "salv[e] el pronunciamiento de inconstitucionalidad decretado por el ilustrado tribunal de instancia", opinión concurrente del Juez Asociado Señor Negrón García, pág. 832, no podemos, en las circunstancias de autos, autorizar el retiro de propiedades del mercado de alquileres cuando el propósito es dedicarlas a la venta.

Por último, reconocemos que la Ley de Alquileres Razonables debe ser revisada para atemperarla a los cambios socioeconómicos ocurridos en Puerto Rico, particularmente en el mercado de alquileres. Sin embargo, "[s]ólo compete a la Asamblea Legislativa, cuya acción es genuino producto de la necesidad y el interés público, alterar o derogar los remedios provistos por la Ley de Alquileres". *Pizá v. Sailles Travel Agency*, 114 D.P.R. 33, 38 (1983), opinión disidente del Juez Asociado Señor Díaz Cruz.

---

*Corte*, 70 D.P.R. 799, 800 (1950).

([4]) Cabe señalar que la Ley de Alquileres Razonables, en su Art. 12-C (17 L.P.R.A. sec. 195), dispone expresamente que subsiste el contrato de arrendamiento en beneficio del cónyuge y los parientes del inquilino titular si éste falleciese sin necesidad de tener que otorgarlo nuevamente.

Notamos, pues, que el legislador dispuso expresamente que la protección de este arrendamiento, al igual que la prórroga involuntaria de 17 L.P.R.A. sec. 192, se transmiten mortis causa en cuanto a la posición del arrendatario también. 17 L.P.R.A. sec. 195. Véase E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ed. Ramallo, 1983, Vol. I, pág. 272.